UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Custom Stud, Inc.,  Civil No. 21-310 (DWF/TNL)

        Plaintiff,

v.

Meadow Lark Agency, Inc.,  **MEMORANDUM OPINION AND ORDER**

        Defendant and
        Third-Party Plaintiff/
        Counter Defendant,

v.

Advanced Specialized Carriers, LLC,

        Third-Party
        Defendant/ Counter
        Claimant.

---

John C. Holper, Esq., Winthrop and Weinstine, PA, counsel for Custom Stud, Inc.,

Alex Herman, Esq., Loren Ungar, Esq., and Michelle Rognlien Gilboe, Esq., Lewis Brisbois Bisgaard & Smith LLP, counsel for Meadow Lark Agency, Inc.

Christopher R. Morris, Esq. and Lauren Curtright, Esq., Bassford Remele, PA, counsel for Advanced Specialized Carriers, LLC.

---

## INTRODUCTION

This matter is before the Court on Third-Party Plaintiff and Counter Defendant Meadow Lark Agency, Inc.'s ("Meadow Lark") Motion to Dismiss Third-Party Defendant and Counter Claimant Advanced Specialized Carriers, LLC's ("ASC")

counterclaims.[1] (Doc. No. 36. ("Motion").) For the reasons set forth below, the Court grants Meadow Lark's Motion.

## BACKGROUND

In May 2015, Meadow Lark hired ASC as a motor carrier to transport a 42,000-pound load of coils from Lakeville, Minnesota to Montgomery, Alabama pursuant to a Broker/Motor Carrier Agreement ("Agreement").[2] (Am. Countercl. ¶ 3; Am. Answer ¶¶ 3-6; *see also* Doc. Nos. 16-1 ("Agreement"); 29-1, Ex. A ("Order Confirmation").) The Order Confirmation specified that the transport would require a 53-foot flatbed and 8-foot tarp. (*See* Order Confirmation.) The Order Confirmation also

---

[1] According to the Complaint, Plaintiff Custom Stud, Inc. ("Custom Stud") contracted with Meadow Lark to transport certain equipment from Custom Stud's location in Lakeville, MN to Montgomery, AL. (Doc. No. 1-1 ("Compl.") ¶ 5.) Pursuant to that contract, Meadow Lark allegedly promised to retain a qualified and competent carrier to transport and deliver the equipment to the intended recipient in accordance with industry standards. (*Id.* ¶¶ 6, 8.) Custom Stud claims that Meadow Lark breached the contract by not retaining a qualified and competent carrier and by not ensuring the equipment was properly protected during transport or timely delivered to the recipient. (*Id.* ¶¶ 10-13.) Custom Stud alleges that as a result of Meadow Lark's breach, portions of the equipment were destroyed or catastrophically damaged. (*Id.* ¶ 14.)

Meadow Lark in turn filed a Third-Party Complaint against ASC, the motor carrier it hired to transport the items, alleging common law claims for indemnity, contribution, breach of contract, and declaratory judgment that ASC was responsible for any alleged damage to Custom Stud's equipment. (Doc. No. 16 ("Third Party Compl.").) ASC responded with various counterclaims (Doc. No. 29 at 1-6 ("Am. Answer"), 6-15 ( "Am. Countercl.")) that Meadow Lark now moves to dismiss.

[2] ASC's principal place of business is in Pineville, LA. (Am. Countercl. ¶ 1.) Meadow Lark's principal place of business is in Billings, Montana. (Am. Countercl. ¶ 2.) The Agreement provides that Montana law controls any dispute between the parties. (*Id.* ¶ D.5.)

stated that ASC agreed to transport the load for $1,650, inclusive of fuel and "any accessorial chargers that may apply." (*Id.*)

Pursuant to the Agreement, any additional rates had to be mutually agreed upon and confirmed in writing. (Agreement at ¶ B.2.b.) The Agreement further advised that "no rates or charges, including but not limited to, accessorial charges," were valid unless they were specifically agreed to in writing (*id.* at ¶ B.3), and Meadow Lark's prior written consent was necessary for ASC to warehouse a shipment (*id.* at ¶ A.7). The Agreement also stated that Meadow Lark agreed to pay ASC for transportation services "upon written receipt of proof of delivery and bill of lading," and that ASC waived its right to collection after a one-year period. (*Id.* at ¶ B.4.)

Pursuant to the Agreement and Order Confirmation, ASC dispatched a driver, Timothy White ("White"), with a trailer and tarp to pick up the load from Custom Stud in Minnesota on May 19, 2015. (Am. Countercl. ¶ 4.) Upon arrival, Custom Stud's personnel loaded ASC's trailer with "bulky, rusted equipment and crates," that weighed significantly more than the 42,000 pounds of coil specified in the Order Confirmation. (*Id.* ¶ 5.) ASC's dispatcher, Joe Mahfouz ("Mahfouz") called Meadow Lark to advise that the material loaded on its truck was not what Meadow Lark had specified in its Order Confirmation and that ASC did not wish to transport it. (*Id.* ¶ 6.) Meadow Lark did not take any action to remedy the situation. (*Id.* ¶ 7.)

After determining that the materials exceeded the legal weight limit, White told Custom Stud that the load was unacceptable. (*Id.* ¶ 9.) Custom Stud attempted to induce White into taking the full load by offering him a cash payment; however, White declined.

(*Id.* ¶¶ 10-11.) Custom Stud proceeded to remove one pallet of steel block from the trailer and represented to White that it had reduced the load by 3,200 pounds. (*Id.* ¶ 12.) Custom Stud also represented to White that the remaining equipment on the trailer was securely bolted together. (*Id.*) Due to its large size, the load was not able to be tarped as specified in the Order Confirmation. (*Id.* ¶ 13.)

While returning to Custom Stud from an off-site weight check to verify that the load was within the legal limit, a piece of equipment fell off the trailer onto the street.[3] (*Id.* ¶ 14.) White determined that this occurred because the equipment had not been properly bolted together. (*Id.*) Despite White's request for help, Custom Stud did not take action to remedy the situation. (*Id.* ¶ 15.) White ultimately contacted the police for assistance and hired a towing company at ASC's expense to remove the fallen equipment from the road and to store it for a period of time. (*Id.* ¶¶ 16, 18.)

ASC proceeded to deliver the remainder of the load to the location specified in Montgomery, Alabama where it was accepted by consignee, Larry LaRue ("LaRue"). (*Id.* ¶ 17.) ASC later retrieved the piece of equipment that had fallen from its trailer and brought it to its secure yard in Louisiana, where it remains, because neither Custom Stud nor LaRue wanted it. (*Id.* ¶¶ 18, 20.)

ASC informed Meadow Lark that it had possession of the item and that there were storage and trailer fees associated with keeping it. (*Id.* ¶ 19.) ASC also sent regular

---

[3]     Removing the pallet resulted in a total weight of 79,100 pounds; within the legal limit, but greater than the 42,000 pounds specified in the Order. (*See* Am. Countercl.* ¶ 13.)

invoices to Meadow Lark from 2015 through 2020 for the transportation of the material that was accepted in Alabama, and separate invoices for the storage costs and fees associated with retaining the piece of fallen equipment, totaling over $50,000.[4]  (*Id.* ¶ 21.) Meadow Lark has neither paid the invoices nor objected to them.[5]  (*Id.* ¶ 30.)

      ASC refutes any allegation that it is responsible for any alleged damage to Custom Stud's equipment and contends that Meadow Lark misrepresented in writing the nature and weight of the goods to be transported, that it never would have sent a truck to Minnesota had it known the true nature of the equipment, that Meadow Lark refused to take any action to remedy the situation when ASC requested assistance, and that no equipment was actually damaged during transit.  (Doc. No. 41 ("ASC Opp.") at 3 (citing Am. Answer; Am. Countercl.).)  Moreover, ASC asserts counterclaims against Meadow Lark for account stated ("Counterclaim I"), breach of implied covenant of good faith and fair dealing ("Counterclaim II"), and misrepresentation ("Counterclaim III").[6]  (Am. Countercl. ¶¶ 31-50.)

---

[4]    The first invoice was sent to Meadow Lark at the address specified in the Order for the transportation in the amount of $1,650.  (Am. Countercl. ¶ 22.)  Subsequent invoices were delivered by ASC, reflecting storage charges of $25/day and a tarp fee of $10/day.  (*Id.* ¶¶ 23, 24.)

[5]    Meadow Lark responded only once by returning a January 31, 2017 invoice with a handwritten note that the invoice was "subject to [ASC's] insurance company as claim." (*Id.* ¶ 25; *see also* Doc. No. 29-2, Ex. B.)

[6]    In Counterclaim I, ASC alleges that Meadow Lark impliedly assented to storing the piece of fallen equipment because it did not timely object to ASC's invoices.  (Am. Countercl. ¶¶ 31-34.)  It seeks the outstanding principal balance plus statutory interest for storing the equipment since 2015.  (*Id.* ¶ 34.)  In Counterclaims II and III, ASC alleges that it incurred costs and inconvenience by having to pay for the removal, storage, and

Meadow Lark argues that all of ASC's claims fail because: (1) they are preempted by the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501(c)(1 ("FAAAA"); and (2) the claims are not supported by the factual allegations in ASC's pleading.[7]  (*See* Doc. No. 38 ("Meadow Lark Memo." at 6-13; *see also* Doc. No. 43 ("Reply") at 3-12.)  Meadow Lark further argues that Counterclaim I fails for the additional reason that the disputed account is governed by the parties' Agreement.  (*See* Meadow Lark Memo. at 4-6.)

## DISCUSSION

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  A court deciding a motion to dismiss may consider the complaint, matters of public record, orders, materials

---

potential disposal of equipment that Meadow Lark wrongly induced it to transport by incorrectly stating or misrepresenting the nature and weight of the goods to be transported.  (*See id.* 35-50.)  ASC asserts that Meadow Lark knew or failed to use reasonable care in communicating the true nature of the goods to be transported, that ASC never would have sent a truck to Minnesota had it known the true nature of the goods, and that Meadow Lark failed to use reasonable care when it refused to take action to remedy the situation after ASC objected to transporting the materials.  (*See id.*)

[7]  The preemptive scope of the FAAAA is interpreted in accordance with that of the Airline Deregulation Act ("ADA").  *See Rowe v. N.H. Motor Transport Ass'n,* 552 U.S. 364, 368 (2008).

6

embraced by the complaint, and exhibits attached to the complaint. *See Porous Media Corp.*, 186 F.3d at 1079.

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id*. at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

### A.   Federal Preemption

Through the FAAAA, "Congress sought to equalize competition between air and motor carriers of property by uniformly preempting state economic regulation of their activities, but not preempting state safety regulations." *Data Mfg., Inc. v. U.P.S., Inc.*, 557 F.3d 849, 851-52 (8th Cir. 2009). The FAAAA therefore preempts state laws "related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). This includes all state laws "'having a connection with, or reference to'" carrier rates, routes, or services, even if the state law's effect on rates, routes, or services "'is only indirect,'" so long as the effect is not too "'tenuous, remote, or peripheral.'"

7

*Rowe*, 552 U.S. at 370-71 (2008) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992)).

While the FAAAA broadly preempts state laws that would regulate interstate transportation of goods, it does not preempt breach of contract claims limited to "the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 (1995). In other words, the FAAAA does not preempt suits alleging breach of a party's "own self-imposed undertakings" because these do not constitute a "violation of state-imposed obligations." *Id.* at 228. Where an implied covenant is a "state imposed obligation" from which the state does not allow the parties to contract around, the law is preempted by the FAAAA. *Nw. Inc. v. Ginsberg*, 572 U.S. 273, 288 (2014) ("When the application of the implied covenant depends on state policy, a breach of implied covenant claim cannot be viewed as simply an attempt to vindicate the parties' implicit understanding of the contract.").

Meadow Lark argues that all of ASC's claims are preempted because they are based in state law and related to the transportation of property. (Meadow Lark Memo. at 3-13; Reply at 3-6.) ASC argues that its claims are not preempted because its damages are separate from transportation rates or damage to property in transit.[8] (ASC Opp. at 10.)

---

[8] ASC also implies that there may be some carveout in the FAAAA's preemption provision for claims brought by motor carriers against brokers. (ASC Opp. at 10.) This argument is foreclosed by the very language in the provision which specifically states that it applies to brokers. *See* 49 U.S.C. § 14501(c)(1) (The FAAAA preempts state laws

The Court first observes that each of ASC's Counterclaims derives from state law. Counterclaim I is based on ASC's allegation that Meadow Lark impliedly assented to storing the piece of fallen equipment because it did not timely object to ASC's invoices. (Am. Countercl. ¶¶ 31-34.) Counterclaim II asserts a breach of contract and covenant of good faith and fair dealing stemming from its allegation that Meadow Lark induced ASC to send a truck to Minnesota based on incorrect information and subsequent refusal to remedy the situation. (Am. Countercl. ¶¶ 35-40.) In Counterclaim III, ASC alleges that Meadow Lark misrepresented the load it was contracted to transport, and therefore placed it in the "impossible position" of having to indefinitely store part of the load that fell of its trailer. (Am. Countercl. ¶¶ 41-50.) The Court finds that each of these Counterclaims clearly relates to Meadow Lark's services as a broker and the transportation of property.[9]

While ASC contends that preemption does not apply because its damages are separate from transportation rates or damage to property in transit, the Court still finds a strong enough connection between its Counterclaims and Meadow Lark's services as a broker to warrant preemption.[10] *Rowe*, 552 U.S. at 370-71. Specifically, all of ASC's

---

"related to a price, route, or service of any motor carrier . . . or any motor private carrier, *broker*, or freight forwarder with respect to the transportation of property." (emphasis added)).

[9] With respect to Count I, the Court finds that the storage of property subject to a transportation agreement is clearly linked to Meadow Lark's rates and service as a broker. The Court similarly finds that Counts II and III, which also allege facts and circumstances directly related to or deriving from the transportation of property, are clearly linked to Meadow Lark's service as a broker.

[10] ASC asserts that its unique situation, which does not seek recovery for damage to goods shipped, is an appropriate exception to FAAAA preemption because Congress did

Counterclaims derive from alleged actions leading up to or following the transportation of property based on Meadow Lark's services as a broker and all require the enforcement of state law. While there are some exceptions for claims involving safety regulations, the Court finds that ASC's Counterclaims are purely economic and precisely what Congress intended the FAAAA to preempt in its attempt to equalize competition.

Moreover, while Counterclaim II alleges breach of contract and implied covenant of good faith and fair dealing, it is still preempted by the FAAAA because the state of Montana, which governs the relationship between the parties, codifies the covenant of good faith and fair dealing. *See* Mont. Code Ann. § 28-1-211. The covenant is therefore a "state imposed obligation," from which the parties cannot contract around, and is thus preempted by the FAAAA. *Ginsberg*, 572 U.S. at 288. The Court declines to unravel any separate breach of contract claim from allegations related to the breach of good faith and fair dealing; however, the Court will dismiss the matter without prejudice so that ASC may attempt to clarify.

Because the Court finds that ASC's Counterclaims are preempted by the FAAAA it need not address Meadow Lark's other arguments.

---

not intend to exempt transportation brokers from tortious conduct that they would otherwise be liable for at common law. (ASC Opp. at 10 (citing *Nyswaner v. C.H. Robinson Worldwide, Inc.*, 353 F. Supp. 3d 892, 896 (D. Ariz. 2019); *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984)).) Notably, the cases ASC relies on to support its position involve tortious conduct that resulted in personal injury. While the Court agrees that some claims are appropriately exempt from FAAAA preemption, the Court finds that ASC's claims, which do not invoke safety regulations and are clearly related to Meadow Lark's services as a broker, are not exempt.

## CONCLUSION

For the reasons set forth above, the Court finds that as pled, all of ASC's Counterclaims against Meadow Lark are preempted by the FAAAA. While ASC may have a legitimate breach of contract claim once untangled from its preempted claim related to breaching the covenant of good faith and fair dealing, the Court cannot conclude at this time that ASC has stated a claim upon which relief may be granted. Therefore, the Court grants Meadow Lark's Motion.

## ORDER

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that Meadow Lark's Motion to Dismiss (Doc. No. [36]) is **GRANTED** as follows:

1. Third-Party Defendant and Counter Claimant Advanced Specialized Carriers, LLC's counterclaims are preempted by the Federal Aviation Administration Act of 1994, 49 U.S.C. § 14501(c)(1 ("FAAAA");

2. Third-Party Defendant and Counter Claimant Advanced Specialized Carriers, LLC's Amended Counterclaim against Meadow Lark Agency, Inc. (Doc. No. [29]) is **DISMISSED WITHOUT PREJUDICE**.

Dated: October 12, 2021                s/Donovan W. Frank
                                       DONOVAN W. FRANK
                                       United States District Judge